Our next case, Maria Torres Nazario v. Commissioner Social Security Mr. Dooling, come on in. Good morning, Your Honors. I'm John Dubin, Rutgers Law School's Civil Justice Clinic, representing the appellate Maria Torres Nazario. I request two minutes for rebuttal time. Thank you. So this is an SSI disability insurance appeal. We raised several points of error. For the sake of expediency, let me briefly address two of the appellant's arguments that are either uncontested or not directly contested and supply a basis for relief in the case before proceeding to the more robustly contested points. Those two points are points 1B and 2B in the appellant's brief. Point one argues more broadly that the ALJ violated this court's precedence in agency regulations in mis-evaluating Ms. Nazario's treating psychiatrist Dr. Carla Hammond's June 2013 opinions in her work-related functional assessment report. Point 1B is a sub-point within that point which the agency has not disputed, arguing that the ALJ fatally erred by failing to apply the relevant mandatory factors in the agency's applicable medical evidence regulations to 20 CFR section 416.927.C2, factors the ALJ must consider in determining what way to accord a treating physician's report, even when the report is contradicted and is therefore not entitled to controlling weight. Those factors include whether the treating source is a specialist and the nature and extent of the treatment. Isn't the commissioner's argument that that was considered, even if it wasn't articulated item by item? Can you point us where in their brief they concede that that was fatal error? They don't concede that, they just don't address it. And therefore, it's uncontested. That's my point, not that it's conceded, but that it's uncontested. And they're salient factors because the treating physician here is a skilled psychiatrist, a board-certified psychiatrist. That's a factor that adds to the probative weight of the report. There should have been analysis in the report that indicated we have considered that this is a skilled specialist, and that's a factor that gets evaluated in how much weight it gets, even if it's contradicted. If you have a report that's contradicted by a non-examining physician psychologist and you have a treating specialist, maybe the treating specialist gets more weight because of the specialization. Isn't the real problem, I thought one of the real problems here was with the hypothetical. Well, true, that's one of our major contested points. The hypothetical acts like this woman has been gainfully employed, and it just doesn't reflect the social functioning deficiencies that she has, nor does it cite the fact that she's probably going to miss four days of work every month. No, I think that's absolutely correct. And when the vocational expert opines that if she was going to miss two days of work a month, there wouldn't be any job she could get. So it just seems to me that the hypothetical is like apples and oranges with the picture that Hammond has painted. Did the ALG have the residual functioning capacity notes? It looks like the two Commonwealth physicians who looked at records didn't have the RFC notes that said she couldn't meet competitive standards in terms of socialization, et cetera. Did the ALJ have those? The ALJ definitely had them. The ALJ mentioned them. And the ALJ conclusorily dismissed them. One of our arguments is that the dismissal of those reports, so conclusorily, not only fails to satisfy treating physician precedent and fails to satisfy this Court's recent precedent in Hess requiring a valid explanation for finding that restrictions on concentration, persistence, and pace are adequately conveyed in a hypothetical, but also it fails to meet this Court's Cotter doctrine that requires adequate and sufficient reasoning in all administrative decisions. Cotter was a one-paragraph discussion, and here we have pages of the ALJ discussing in detail which pieces of evidence it found contradictory to the ultimate conclusion reached by the treating physician. Actually, there's only one page, Your Honor, of analysis of the psychiatric evidence in the entirety of this 11-page decision. And there's really only one short paragraph, a few sentences, that attempts to explain rejection of the parts of the treating psychiatrist report that indicate that Ms. Nazario cannot sustain competitive work. With respect to that portion, which is applicable, the ALJ speaks to both treating psychiatrist Hammond and board-certified advanced practice treating nurse Aramid and says these reports, she refers to the reports by exhibit numbers but not even to these sources. She says there is no medical evidence consistent with the proposition that the claimant would not be able to sustain work at the residual functional capacity identified above, including low contact. That is the only analysis in the opinion of direct evidence addressing specific concentration, persistence, and pace, what I call production, output, and speed, performance speed-based limitations from sources who've actually seen the claimant. And the ALJ's analysis and explanation is fatally deficient on several bases. First, it says there's no evidence, but there is evidence. In fact, these reports themselves are evidence. This is an extensive five-page report by a skilled treating psychiatrist. That's evidence. You're referring to the checkbox reports? I'm referring to Dr. Hammond's reports, yes. And the ALJ didn't find any problem with the checkbox report. He relied on the portion of it that he found supportive of his opinion. He relied on the checkbox forms that were submitted by the non-examining physician. Checkbox nature of the forms is not an issue in this case, not relied on by the ALJ. The non-examining physicians had Dr. Hammond's treatment notes, right? They didn't have the final report. That's right. From Dr. Hammond or the nurse. They didn't have the extensive work-related functional capacity assessments that translate these weeks and weeks of treatment into an assessment of how they would play out in a workplace. But they are reaching a different conclusion based on the same medical evidence. That is, the treatment notes. Also, their observation. We only have some treatment notes, but we know that they've been seen every two weeks. We don't have biweekly treatment notes in this record, but we know that they have observed and seen over every two-week period, as is mentioned in the record. And we have congruence between these reports. Both of these treating sources reach the same conclusion. Both of them find, using slightly different language, that Ms. Nazario cannot perform, cannot sustain competitive work. They do find that she can understand and carry out simple instructions. She has the cognitive capacity for that, but she can't sustain it. Dr. Hammond says can't sustain it because she's unable to complete a normal workday without interruptions from psychiatrically-based systems in a manner that's not competitive. In this case, didn't the ALJ actually put those questions, that is, questions that contained those specific limitations, into the hypotheticals to the vocational expert? So is your objection there really that that wasn't considered or included in the hypotheticals, or that ultimately you disagree with which of the hypotheticals the ALJ embraced to reach a decision? Both, Your Honor. Certainly we disagree with the hypothetical that the ALJ relied on. We think it doesn't sufficiently capture the full extent of the parents' condition as reflected in these extensive, too extensive, treating source reports. But- Go ahead. Oh, I'm sorry. I didn't mean to interrupt. Well, I was going to say that her testimony and the non-competitive standards seem very consistent. This woman couldn't go to college because she couldn't be around people. She doesn't go out and do errands on her own. She prefers to be in a dark room. The picture that's painted in her testimony is this woman can't be in a workplace. I couldn't agree more, Judge Randall. And it seems to be totally ignored by the ALJ. He doesn't say there's a lack of credibility, but he credits the fact that she got a college degree. She did it online because she couldn't be with other people. And the RFC pretty much lays that out. So when the hypo says she can have occasional interaction with coworkers, supervisors, and the general public, she can handle changes to essential job functions on an occasional basis, it doesn't reflect the fact that the RFC says she can't. She can't do these things. She can't be in a social setting. I completely agree with that assessment, and I'd point out that the agency defines occasional contact as up to a third of the day. That's two, two-and-a-half hours, more than two-and-a-half hours every single day, having contact with someone who has indicated she never leaves the house unless it's absolutely necessary, socially isolates herself and isn't around any people. Not to mention the interference with her concentration and focus that she mentioned was a factor when she was in college that required her to drop out, that together with the panic attacks and the anxiety of being around people. Counselor, is it standard practice for an ALJ to ask alternative hypotheticals, some of which include specific limitations and some of which do not? And then not use the ones that include those limitations? We certainly see it. I had an argument before Judge Hayden a few years ago where she called those questions the dummy questions. She calls them dummy questions because she says it makes the representatives dumb. They hear the ALJ mention these other hypotheticals that sound like, oh, wow, we're going to win this case. You're going to include 25 percent off task or two days absent from work. But then they pick the third hypothetical, which doesn't include any of those limitations. Is there a reason to include a limitation if it's not relevant to the case? I mean, I think in defense of the ALJ, the argument you may hear, I don't want to put words in opposing counsel's mouth, but you may argue that the ALJ might be asking these questions simply because he's not entirely sure what the RFC is when the question was asked. I'd have to say if that is the response, that would be far less likely in this case because the ALJ had all the evidence and testimony to analyze and determine the functional capacity from the June 2014 hearing. This is almost a full five months before the ALJ then sent out interrogatories to the vocational expert with those questions. You'd think in five months with a full record, all the claimant's testimony, all of the evidence in the case, the ALJ would know what the RFC is. And if he's positing questions that include 25 percent off task, two hours of an eight-hour day, and inability to make it to work two days a week, that he had some basis for that. Certainly he had the full record for that basis. Now, if on retrospect he thought, well, maybe it's not quite 25 percent, maybe it's 20 percent off task, maybe it's 15 percent off task, well, he should have included those limitations in the hypothetical. At least we'd know we would have translation of functional limitations in some manner that is concrete and is meaningful for a vocational expert because a vocational expert knows nothing about the meaning of moderate. How do we say no substantial evidence? Substantial evidence is a very, very, very low threshold for our ability to affirm the agency. There's no substantial evidence here? Yes, I would say there is no substantial evidence here because I could go through each and every piece of evidence, but the non-examining physicians have an incomplete file. The consultant evaluator, who's viewed as providing conflicting evidence, actually found that Ms. Nazario was distracted and preoccupied by her condition, doing simple arithmetic exercises in the course of this short evaluation. One-shot evaluation. And he also found that there was nothing in her presentation of her symptomology that suggested that she was exaggerating her condition or malingering. He credited her symptomology. I find those a supporting report to both to her testimony and to her overall record in this case, and I see I'm out of my time. Thank you. We'll hear from you in rebuttal. Ms. Cooper? Good morning. Good morning. I'm Jordana Cooper. I represent the Commissioner of Social Security. Good morning. If I may, I'd like to start where the conversation was heading, which is the substantial evidence that would support the ALJ's finding that despite some evidence in the record, the claimant's testimony is some evidence, and it's important evidence. The form from Dr. Hammond is evidence, and it's important evidence. But what is it that contradicts that information that the ALJ was keyed to when he discounted somewhat those pieces of information in the record? But how about the violation of Morales? How about the fact that he didn't treat Hammond's – Hammond is a treating physician, and the advanced practice nurse, their reports are in lockstep, that this woman can't meet these pretty important competitive factors. And the ALJ pretty much discounts it. It doesn't even – under Morales, that should be the key evidence that should carry the day, should it not? It can, and sometimes it does. And in Morales, there were problems with the ALJ's evaluation of the disability forms. Okay. Don't we have that here? In Morales, if I may, just for one moment on that point, the ALJ relied on the ALJ's own speculation about the claimant's laziness and his own personal observations at the hearing, and that obviously gave this court pause and concern and was dissatisfied. Here, however, there was information in the record from Dr. Hammond herself that the ALJ emphasized, and that is critically important evidence. If the court looks at the treatment notes, once treatment is underway, and I'm looking, for example, at the record at 1073, 1074, 1075, that information shows a 100% normal mental status examination repeatedly. That means normal mood, normal judgment, normal insight. Every single mental status checkbox is normal. And mental capacity. Yes. How about social function? So the other thing that's shown by those notes, Your Honor, is that they say nothing about certain problems. If Your Honor looks at the notes, they say nothing about being unable to be near others, nothing. And then we also at the agency, and this is another component of the substantial evidence analysis, sent this lady for a consultative examination with Dr. Yalkowski. And one of the facts that is in that report is that she was pleasant and friendly with intact social skills and no serious psychopathology. So although the ALJ accepted that this was a claimant who did prefer to have a lower level of social contact, he did not end up crediting for reasons that were grounded firmly in the record, as contrasted with Morales, where the court was concerned that the ALJ was doing his own speculation. But aren't those the very errors that we found fatal in cases like Brownwell and Morales, too, where a reference, for example, to good focus, good attention, good concentration, we observed was not inconsistent with the conclusion that someone was unable to work for sustained periods, recognizing that there's a difference between how someone behaves and performs in a home or a treatment setting versus in a work setting with the stresses of a work environment.  And in some cases, there is a history that is really marked by high levels of mental illness. And, Your Honor, that simply wasn't the case here. At least the ALJ had the fact-finding latitude under a substantial evidence test to find otherwise. This was a claimant who sought very limited mental health treatment, who was able to raise her family independently, who was able to shop. She did not say in her testimony that she could not shop alone. I'm sorry, in her function report, that she could not shop alone. She said that she sometimes shopped alone. It's not exactly the same as her testimony. She was not noted in any of the treatment records to have an inability to socialize or to go outside of her home. She's not diagnosed with agoraphobia. So those things do happen. In some cases, you will see a history that's marked like that. But here, she sought treatment only in 2012. Even when she presented, the doctors described her impairment as moderate, not extreme. And once she started the treatment, within a few months, they find that her symptoms, her own doctors, are only mild. And, in fact, if Your Honors would look at the form submitted by Dr. Hammond, not only Dr. Hammond's treatment notes, but the actual form, because I know that's the focus of the questioning, the form itself, the narrative portion of that form, says a few things. What page are you reading from? I'm reading from the AR at 52, I believe, Your Honor. But let me, I'm not sure that's correct. N25. Bear with me. I apologize. I'm looking at AR 1064, which is also marked transcript. Let's go to 1065, which is also marked transcript 1025. And that's the form from Dr. Hammond. There's a lot of forms of Dr. Hammond. Okay. Well, so there's the medical source statement and the treatment notes. So the medical source statement is what the plaintiffs are relying on, as well as her testimony, because of the checkboxes. But that same form, which is at the record at 1065, tells the reader a number of important things before it gets to the checkboxes. And these are things that the ALJ did not overlook and commented on specifically. Client has responded well to treatment. Client's symptoms of anxiety and depression have persisted, but lesser extent. That's fine. But how about the fact that both Hammond and Aramid, who saw this woman repeatedly, in response to a question as to whether she'd be absent from work, they had the choice of picking never, one day a month, two days a month, three days a month, four days a month, or more than four days a month. Both of them picked more than four days a month. That's not in the hypothetical. And isn't that, in and of itself, that these people are saying there is no way this woman is going to be in the workplace day after day after day. So Your Honor is certainly identifying a factual finding that could be made from this record. The question is whether that's a factual finding that must be made. Well, should it have been in the – should there be some reference in the hypothetical? And so, Your Honor, there were alternative hypotheticals. And to Judge Powell's question earlier, my view on that subject is that the ALJ will frequently include those questions so that it streamlines the hearing or hear the sending of interrogatories. And when the ALJ propounded alternative hypothetical questions, they were on this issue about sustaining work activity. And the ALJ addressed that in the ALJ's decision, which is – Why would an ALJ ask a question that did not have relevance to the claimant before him or her? So this is a – it's a common occurrence. If we were at a hearing, and we had a VE at a hearing, and we had a claimant's attorney at a hearing, often, in my experience, the ALJs will ask questions that the claimant's attorney on cross would ask to get them out of the way. To get them what? To get them taken care of so that they don't – it's more efficient. So that will frequently happen. And then if the ALJ, upon further study of the record, finds that those limitations are appropriate to include for this claimant, then the ALJ will have those answers to adopt. Here, it was a similar situation, but by way of interrogatories. But what's the basis for rejecting that finding by the treating physician and the nurse? So there are a few bases, Your Honor. In the ALJ's decision at the record, page 55, the ALJ explains that he's looked at this issue of her ability to sustain work. That's what those two alternative hypos and the checkboxes in Dr. Hammond's form address. And the ALJ says, I've looked at this issue about being able to sustain work, and I find that there's no medical evidence consistent with the proposition that she'd not be able to sustain work at the RFC identified above, including low contact. And the low contact piece, Your Honor, is important because she did explain that – she did testify that she would prefer a lower contact situation. That's why she switched from community college to an online college. And the ALJ credited that to a certain degree. But now you're pointing to her testimony. And the ALJ's statement is not that he's basing this on her testimony. He's saying that there is no medical evidence, none whatsoever, that would be consistent or support the conclusions of the treating physician and nurse. Does that accurately reflect the record in your view? It does, Your Honor, because the evidence is really – the medical evidence for this proposition comes from Dr. Hammond's checkbox and Ms. Aramid's checkbox form. And what he's saying is, I'm comparing that checkbox to the rest of the medical record, and I'm not finding it. I'm not finding it. Well, how about the anxiety, the panic attacks? And that would probably, to my mind, when Hammond and Aramid say that she can't function with other people, because she has these attacks and this anxiety, and she testified to that. So Your Honor is crediting her testimony essentially in full. And again, that is a fact-finding that – And he credited it. He didn't say she was a malingerer. The ALJ, you're saying, Your Honor? Yes. He didn't say she's a malingerer, but he did say that he discounts her credibility in part. In other words, he's not accepting that she's unable to perform work in a low-contact job. And mind you, during the period that we're talking about, she was also operating as a babysitter. She stopped that. She couldn't stand it. She had lost children. Correct. And so then the ALJ understood that fact and explained specifically that job is not suitable for her. But that's another way the hypothetical was wrong, because it says she has work experience as a babysitter and an airplane cleaner. She hasn't worked in ages. So that's the way the process works, Your Honor. Those pieces of information are given to – I mean, we all know what a babysitter does. So once the ALJ tells the vocational expert that this should be a low-contact position, we all know because we know what a babysitter does that the vocational expert is going to say that the past work is not appropriate. And, of course, that's what happened here. But even the information from her own personal experience, I mean, the idea that she is independently raising her children when her testimony is that she gets a phone call to be woken up and how she raises them is waking them, sometimes cooking. And other than that, when it comes to even basic functions like shopping, that she needs assistance and accompaniment. Don't we have the concern here, as we did in Morales, that when we're talking about mental health treatment, we should be particularly concerned about an ALJ substituting their own medical judgment for that of the treating physician? Two responses, Your Honor. Of course, we have to look carefully at the record, and we have to make sure that the ALJ is not doing what Your Honor just stated. Here, we had testimony to the effect that Your Honor is stating, but it wasn't uncontradicted. The claimant's own form before her testimony did not say that she couldn't shop. It said that she shopped in stores. That's at the record of 249. That when she didn't have somebody to accompany her, she could still go. She went out alone. She said that. She can use public transportation. She said that. She arrived at her consultative examination using public transportation, and she had intact social skills. So there's always some conflicting evidence. The other point that Your Honor is making in terms of medical review is that the ALJ did have the views from two experts, a state agency expert psychologist, Dr. Ben Savine, and an expert psychiatrist, Dr. Campion, who also looked at available records and made essentially the precise finding that the ALJ made, which is that despite the moderate, this claimant is assessed with moderate limitations, not extreme or marked, but despite the moderate limitations that this particular claimant has in the areas of social functioning and concentration persistence. They didn't have the RFC records. They didn't have the statement, the checkbox form. That form. They didn't have that form. That's correct. And so that is almost always the way a case progresses. And then the ALJ looks at the treatment records. And, in fact, what the ALJ had was later treatment records from 20 into 2013 that, as I said at the opening, if Your Honors review them, we'll show it, 1073, 1074, 1075, for example, 100% normal mental status and saying nothing about an inability to socialize. And, in fact, you'll see in one of those treatment notes it says, you know, everything is normal, everything, including mood. There's not anxiety noted other than, and there's a GAF score of 65, which is a very high score. It reflects somebody with mild symptoms. Mild. She goes from moderate to mild. So what the state agency doctors did not have was the later treatment notes, which I'm explaining right now, show fully normal mental status, only mild symptoms, and the ALJ, nonetheless, still goes with the views of the state agency experts and gives her a low-contact, takes a person that just completed college and puts her in a low-contact simple job to account for. She completed college after five and a half years because she had to do it online and couldn't tolerate being around people with panic attacks. Right. Respectfully, Your Honor, many people do college in five years, and she was raising children. So what he does to account for that, again, he's trying to draw a reasonable conclusion that is respectfully grounded in the evidence. It does not reflect a 100% acceptance of the claimant's testimony. It does not reflect 100% acceptance of Dr. Hammond's form, but it does reflect a logical, reasonable conclusion from the full evidentiary picture. It is grounded in that evidentiary picture, not based on the ALJ's own speculation. It has medical expert support, and respectfully, under the B-STEP standard, which is not high, just whether a reasonable mind could direct a verdict and preclude this case from going to the jury, respectfully, I would say that the answer is no. Counsel, I'd like to ask you a question. I'm going to extend your time a bit. Just about that standard you referenced in the regulation, because it reflects that the medical opinion from the treating source is entitled to special significance, may be entitled to controlling weight, and if that opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record, the adjudicator must give it controlling weight. Doesn't that in some ways seem to alter the burden? It's sort of an inverse in terms of what role the substantial evidence plays. That is, as I read this regulation, it seems to be saying, if you have a treating physician's report that's based on acceptable clinical and laboratory techniques, then it's going to have controlling weight unless it is inconsistent with other substantial evidence. So that's correct, Your Honor. I don't see it as flipping a burden, but what it does mean is that in order for an ALJ decision to be appropriate, it has to give appropriate reasons for discounting a treating source opinion. Here, you're not permitted under the regulations to properly give a treating source opinion controlling weight if it's contradicted by other substantial evidence in the record. And here, when we have the physician's assessment, not just like stray words in the reports, but the physician's treatment notes generated in the time leading to her checkbox form, saying my assessment is that this person is doing well. Not doing better from some very low baseline, but actually doing well that the medications have regulated her mood, that she has a GAAP score of 65, which is very high, only in the realm of mild symptoms. Her concentration and memory are both listed repeatedly as intact. That's the kind of evidence that, if properly viewed by an ALJ, would not permit a checkbox form from a treating physician to get controlling. What page are you reading from? At 1073, Your Honor, in the record. It's also marked 1033. There's so many. I appreciate that. There's so many notes. He says prognosis, mediocre. Her anxiety is better, but not wholly. That's correct, Your Honor. On the form itself, it does say those things. But then the ALJ's job, because we don't simply have treating physician writing notes and then awarding benefits, obviously, what we do is we have the ALJ test that against the record. And when the testing occurs against the treating physician's own notes, instead of saying mediocre, saying she's responding well, she's doing well, she only has mild symptoms, that's the kind of a situation that the ALJ is supposed to be scrubbing for, because otherwise we'd just have treating doctors writing a note. Of course, you could say that in her very controlled environment. You could, but his own form, even the checkbox form itself, says that she's responded well. And if a claimant is unable to leave the house, for example, if a claimant is unable to shop for her children, it's hard to imagine, or certainly a reasonable fact finder could question whether her own doctor would say she's responded well, she has a GAF score. You can respond well to treatment and still be deathly ill. It's true. Aren't the very next words to medication and treatment? Yes. So that's what the doctor is reporting she responded well to. Isn't that exactly what we were addressing in Brunwell, where we were looking at language like stable and under control? Yes, Your Honor. In this case, however, for example, and the treatment notes themselves, which are important for the ALJ to consider as well as the checkbox form, the assessment is doing well, not just stable. There's the box checks for stable, improved, doing well, and mild symptoms in the GAF score. So if a person has mild symptoms, what the ALJ ended up doing, which again may not be the same conclusion that every single person sitting in the ALJ's chair would reach, but the question is whether this ALJ was permitted to reach that conclusion, that if I account for low contact and I take this recent college graduate even out of complexity, do I think that there are jobs that she could appropriately perform? And the answer that he came up with, supported by multiple sources of evidence, was yes. Thank you, Your Honor. Thank you. Well, I agree, Judge Krauss, with your suggestion, with your observation that the treating physician regulations and the controlling weight aspect of that shifts the burden, in essence, by making that declaration about the nature of treating physician evidence and why it can be controlling. I would point out as well that the rest of the regulation does as well. Even when the treating physician report is controverted by substantial evidence, my point 1B that I started my argument out with, which I said was uncontested by the agency, that second part says you still have to consider what weight to give the treating physician report, even if it's controverted by substantial evidence, and you have to apply factors such as considering whether the treating is a specialist and considering the frequency of treatment, which here is every two weeks. That's very significant treatment. And neither of those factors were considered in that case, and that is a fatal error of law, as recognized by the Second Circuit Justice Sommer in Estrella and earlier in the Ninth Circuit in the Treviso case. How do you reconcile that use of substantial evidence in the regulation on acceptance of a treating physician's opinion and our standard of review of substantial evidence supporting the ALJ's decision? Yeah, the standard of review is deferential in review of facts, but it's not deferential with respect to application of the law. And application of the law is application of the regulations. The regulations are mandatory. If the regulations are not followed, that's an error of law that requires a remand. That's a very settled law of this circuit and all circuits. I agree as well with your observation that this case is on all fours with Brown, Ewell, and Morales. I would point out as well that those decisions, as well as a plethora of circuit decisions, document that mental impairment conditions historically, traditionally, are known to fluctuate, that people have good days and bad days. They have periods of improvement and periods of deterioration. We heard mention to an isolated period in 2013 where there was some improvement in her condition. But we see by 2014, when Nurse Aramid gave her report, Nazaria was having two to three severe sudden panic attacks every week, and she now again had dizziness as a side effect from her medication when she didn't have that side effect in 2013. We also, as Judge Rendell pointed out, we had a prognosis, a diagnosis from Dr. Hammond, the treating psychiatrist, that was mediocre. This is looking at the future, even acknowledging improvement. Overall prognosis is mediocre, which means it's not going to get that much better. I also agree with the suggestion that when you rule out or reject the treating physician because of an isolated period of time, you're in essence substituting your lay view of the evidence for that of the treating. It's a treating that has a longitudinal base of information in which to rely, in which to determine whether we've got ups and downs going on or whether we have something that is an incline, that's going to continue on an incline or it's going to stay at some functional level. And here, the skilled treating physician, in concurrence with the skilled board certified advanced practice nurse, had concluded otherwise. Counsel, keeping in mind that what you are describing as suggestions or observations or in the context of our questions to counsel, let me ask you one. Because when it comes to the deference to be paid to a treating physician's opinion, it's not only if it's consistent with techniques, medically accepted techniques, but also with evidence in the record. And here, the ALJ spoke at length about specific pieces of evidence in the record that he considered contradictory. Both from testimony and from other observations in the treatment notes. So why isn't that enough, given our deferential standard of review, to uphold the ALJ's determination? Okay. Well, Dr. Hammond knows her own treatment notes. Mindful of the ups and downs that are reflected in those treatment notes, her longitudinal assessment for work-related functional capacity shows otherwise. And her prognosis shows otherwise. Mindful of that. So that doesn't contradict it, based on her own assessment. Same with Aramid, who's in privity at Mount Carmel Guild Behavioral Clinic. I've already outlined why I believe the non-examining reports cannot constitute substantial evidence, because as Judge Rundell pointed out, they don't have a full file. It's the same situation as it was in Morales. Morales pointed that out as well. Those reports were prepared after the non-treating physicians prepared theirs. So that's not really a fault in the review of the evidence. Oh, I'm not saying it's a fault. It's just an input-output situation. The output of the non-examining is only as good as the input they get. And if they're not getting these very extensive reports that are directed specifically to work-related functioning, what's most significant in a disability assessment, how it affects ability to work, then they're acting on a substantially incomplete and deficient slate of information. The output, therefore, already diminished by the fact that they're non-examining, so they've never seen, which is why in decisions in cases like Brown, Well, and Dorff, this Court has eschewed reliance on non-examining reports, even with a full record, but with an incomplete record, as in Morales, even less so. Why don't you go a bit beyond your time? Okay. Thank you again, Your Honor. Thank you. Thanks to both counsel for excellent arguments today. And we will take the case under advisement.